**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ SEP 2 4 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

THE STATE OF NEW YORK,

                Plaintiff,

        -against-

THE UNITED STATES ARMY CORPS OF
ENGINEERS; COLONEL CHRISTOPHER LARSEN,
*in his official capacity as Division Engineer, North
Atlantic Division of the United States Army Corps of
Engineers*; THE UNITED STATES FISH AND
WILDLIFE SERVICE; ROWAN W. GOULD, *in his
official capacity as Acting Director of the United States
Fish and Wildlife Service*; THE UNITED STATES
NATIONAL PARK SERVICE; JONATHAN B.
JARVIS, *in his official capacity as Director of the
United States National Park Service*; THE UNITED
STATES DEPARTMENT OF THE INTERIOR;
KENNETH SALAZAR, *in his official capacity as
Secretary of the United States Department of the
Interior*; THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; LISA JACKSON, *in her
official capacity as Administrator of the United States
Environmental Protection Agency*; THE DELAWARE
RIVER BASIN; and CAROL COLLIER, *in her official
capacity as Executive Director of the Delaware River
Basin*,

                Defendants,

        -and-

AMERICAN PETROLEUM INSTITUTE;
INDEPENDENT PETROLEUM ASSOCIATION OF
AMERICA; and US OIL & GAS ASSOCIATION,

             Putative Defendant-Intervenors.

--------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-2599 (NGG) (CLP)**

1

---------------------------------------------------------------------X

DAMASCUS CITIZENS FOR SUSTAINABILITY, INC.,

Plaintiff,

-against-

THE UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL CHRISTOPHER LARSEN, *in his official capacity as Division Engineer, North Atlantic Division of the United States Army Corps of Engineers*; THE UNITED STATES FISH AND WILDLIFE SERVICE; ROWAN W. GOULD, *in his official capacity as Acting Director of the United States Fish and Wildlife Service*; THE UNITED STATES NATIONAL PARK SERVICE; JONATHAN B. JARVIS, *in his official capacity as Director of the United States National Park Service*; THE UNITED STATES DEPARTMENT OF THE INTERIOR; KENNETH SALAZAR, *in his official capacity as Secretary of the United States Department of the Interior*; THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LISA JACKSON, *in her official capacity as Administrator of the United States Environmental Protection Agency*; THE DELAWARE RIVER BASIN; and CAROL COLLIER, *in her official capacity as Executive Director of the Delaware River Basin*,

Defendants,

-and-

AMERICAN PETROLEUM INSTITUTE; INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA; and US OIL & GAS ASSOCIATION,

Putative Defendant-Intervenors.

---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-3857 (NGG) (CLP)**

2

---------------------------------------------------------------------X

DELAWARE RIVERKEEPER NETWORK; THE
DELAWARE RIVERKEEPER; RIVERKEEPER, INC.;
THE HUDSON RIVERKEEPER; and NATIONAL
PARKS CONSERVATION ASSOCIATION,

                Plaintiffs,

      -against-

THE UNITED STATES ARMY CORPS OF
ENGINEERS; COLONEL CHRISTOPHER LARSEN,
*in his official capacity as Division Engineer, North
Atlantic Division of the United States Army Corps of
Engineers*; THE DELAWARE RIVER BASIN
COMMISSION; and CAROL COLLIER, *in her official
capacity as Executive Director of the Delaware River
Basin Commission*,

                Defendants,

      -and-

AMERICAN PETROLEUM INSTITUTE;
INDEPENDENT PETROLEUM ASSOCIATION OF
AMERICA; and US OIL & GAS ASSOCIATION,

                Putative Defendant-Intervenors.

---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-3780 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Before the court are three suits, consolidated for pre-trial purposes only, between

Plaintiffs New York State, Damascus Citizens for Sustainability, Inc., ("Damascus Citizens"),

Delaware Riverkeeper Network, the Delaware Riverkeeper, Riverkeeper, Inc., the Hudson

Riverkeeper, and the National Parks Conservation Association (collectively, the "DRN

Plaintiffs") against Defendants the United States Army Corps of Engineers, Christopher Larsen,

in his official capacity as Army Corps of Engineers Division Engineer, North Atlantic Division,

the United States Fish and Wildlife Service, the United States National Park Service, the United

States Department of the Interior, the United States Environmental Protection Agency, and the

heads of the preceding four agencies, in their official capacities (collectively the "Federal

Defendants") and Defendants Delaware River Basin Commission (the "DRBC") and its

Executive Director, Carol Collier, in her official capacity (collectively the "DRBC

Defendants").[1] Plaintiffs have brought suit over the Federal Defendants' and the DRBC's belief

that none of the Defendants are required to comply with the National Environmental Policy Act,

42 U.S.C. § 4321 et seq., ("NEPA") while the DRBC drafts and considers regulations that would

permit natural gas development in the Delaware River Basin. The Defendants have moved to

dismiss Plaintiffs' Complaints for lack of subject matter jurisdiction and for failure to state a

claim for which relief can be granted; the Federal Defendants have moved in the alternative for

summary judgment. Plaintiffs have cross-moved for partial summary judgment on Defendants'

liability.[2] Upon due consideration, Defendants' motion to dismiss all three Complaints for lack

of subject matter jurisdiction is granted without prejudice.

## I.   BACKGROUND

### A.   THE DELAWARE RIVER BASIN COMMISSION

The DRBC is a creation of the Delaware River Basin Compact, an agreement among the

United States, New York, Pennsylvania, New Jersey, and Delaware, and was approved by

---

[1]     Although the DRN Plaintiffs and Damascus Citizens have filed separate Complaints, they have filed joint briefing regarding the dispositive motions before the court. The court refers to these two sets of Plaintiffs collectively as the "Non-Governmental Organization Plaintiffs" or the "NGO Plaintiffs." The DRN Plaintiffs have brought suit against the Army Corps of Engineers and its Division Engineer, but not the other Federal Defendants. To the extent this distinction in Defendants is relevant to any issue the court discusses, it will note that fact.

[2]     The court acknowledges the contribution of multiple amici curiae, including the Council of the City of New York, the Philadelphia City Council, and the Chesapeake Bay Foundation in support of Plaintiffs, and the American Petroleum Institute, Independent Petroleum Association of America, and the US Oil and Gas Association (collectively, the "Oil and Gas Industry") and the Susquehanna River Basin Commission in support of Defendants. Their viewpoints have been helpful to the court's understanding of the factual issues and legal issues presented in these cases.

4

Congress in 1961. (DRBC Defs. Mem. (11-CV-2599 Docket Entry # 76-1) at 1.) The Compact was intended to manage the water resources of the Delaware River Basin. (*Id.*) The DRBC has the authority to establish standards for the "operation of all projects or facilities in the Basin which affect its water resources." (*Id.* at 2.) The DRBC is made up of five commissioners, one for each of the signatory states and the United States government; the governors of the four states serve as the state commissioners and the Division Engineer of the North Atlantic Division of the Army Corps of Engineers is the federal commissioner. (*Id.*)

The correct characterization of the DRBC as a federal agency or a federal-interstate compact agency is something about which the parties disagree. The Compact declares that the DRBC is created "as an agency and instrumentality of the governments of the respective signatory parties." Delaware River Basin Compact § 2.1. When Congress approved the Compact, it included reservations that specified that the DRBC would be considered a federal agency as to certain provisions of federal laws but not for others, such as the Administrative Procedures Act (the "APA"). *See* Delaware River Basin Compact § 15.1 (i)-(m). Congress also specified that the employees of the DRBC would not be considered federal employees. *Id.* § 15.1 (n). Congress then specified that the Compact would not "be deemed to enlarge the authority of any Federal agency other than the commission." *Id.* § 15.1 (o).

The DRBC is responsible for creating and updating a "comprehensive plan for immediate and long range development and uses of the water resources of the Basin to which federal, state, and local agencies and private parties are bound." (DRBC Defs. Mem. at 2-3.) If the federal member of the DRBC—that is, the Division Engineer of the North Atlantic Division of the Army Corps of Engineers—"concurs" in the comprehensive plan or in amendments or revisions to it, "the exercise of any powers conferred by law on any officer, agency or instrumentality of the

5

United States with regard to water and related land resources in the Delaware River Basin shall not substantially conflict with any such portion of such comprehensive plan." *Id.* § 15.1 (s). Of most immediate relevance to the issues that sparked this litigation, "[n]o project having a substantial effect on the water resources of the basin shall [] be undertaken by any person, corporation or governmental authority unless it shall have been first submitted to and approved by the commission." Delaware River Basin Compact § 3.8. The DRBC determines whether to approve a project by evaluating whether the "project would [] substantially impair or conflict with the comprehensive plan." *Id.* The DRBC is also given the authority to make regulations as necessary to enforce and effectuate the Compact, including regulatory authority to control or abate water pollution in the Basin. (DRBC Defs. Mem. at 4.)

B.   NATIONAL ENVIRONMENTAL POLICY ACT

NEPA has "twin aims": it imposes on federal agencies "the obligation to consider every significant aspect of the environmental impact of a proposed action," and it "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983). A federal agency must prepare what is called an environmental impact statement ("EIS") to accompany a federal action, which includes "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; [and] new or revised agency rules, regulations, plans, policies, or procedures." 40 C.F.R. § 1508.18(a). An EIS should include:

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable

6

commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(c).

NEPA is implemented through regulations promulgated by the Council on Environmental Quality (the "CEQ"). These regulations call for an agency to "commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal." 40 C.F.R. § 1502.5. Further, "[f]or informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule." *Id.* § 1502.5 (d). However, the CEQ makes clear that "judicial review of agency compliance with these regulations [should] not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact [], or takes action that will result in irreparable injury." *Id.* § 1500.3.

After NEPA was enacted in 1970, the DRBC promulgated regulations implementing it as to its own operations. (NGO Pls. Mem. (11-CV-2599 Docket Entry # 79-1) at 4-5.) The CEQ's guidelines on preparing EISs published in the 1970s included the DRBC as a federal agency. (*Id.* at 5.) The DRBC performed NEPA analyses during that decade. (*Id.*) In 1980, however, the DRBC suspended its NEPA-implementing regulations due to lack of financial resources and indicated it would rely on an agency of the federal government to serve as "lead agency" and perform EISs for DRBC projects. (*Id.*) In 1997, the DRBC repealed its NEPA regulations. (*Id.*)

C.    NATURAL GAS DEVELOPMENT

Part of the Delaware River Basin is above the Marcellus Shale geological formation, which contains natural gas. (Silver Decl. (11-CV-2599 Docket Entry # 77-5) ¶ 7.) Extraction of such gas would require horizontal drilling and the use of hydraulic fracturing ("hydrofracking"), a "technique that liberates the natural gas by pumping millions of gallons water, sand, and

7

chemicals [] under high pressure deep underground." (*Id.*) Any hydrofracking that were to occur within the Delaware River Basin could affect the Basin's water resources in at least three ways: an extraction operation would require large amounts of fresh water from the Basin's rivers and aquifers; the drilling operations might release pollutants into the ground or surface water; and the "flowback" i.e., the water used to fracture the formation, would need to be treated and disposed of in some way. (*Id.* ¶ 9.b.) For these reasons, a natural gas development project would require the approval of the DRBC. The Executive Director of the DRBC has referred applications for approval of gas extraction and exploration projects to the DRBC itself; in May of 2010 the DRBC directed its staff to develop draft regulations regarding natural gas extraction and deferred consideration of any application until such time as it adopted regulations governing it. (DRBC Defs. Mem. at 6-7.)[3] This has created what the parties refer to as the moratorium on natural gas exploration and extraction in the Basin.

On December 8, 2010, the DRBC voted (with New York's commissioner opposed) to release draft regulations for public comment. (NGO Pls. Mem. at 7-8.) In April of 2011, the New York Attorney General submitted comments to the DRBC requesting it perform a NEPA analysis along with its draft regulations, and wrote to the Division Engineer of the Army Corps of Engineers, with copies to the other Federal Defendants, arguing that one of the Federal Defendants should create an EIS. (NYS Mem. (11-CV-2599 Docket Entry # 77-1) at 7.) The Division Engineer responded with a letter denying any obligation to perform a NEPA analysis as part of the DRBC's regulatory drafting. (*Id.*) In November of 2011, the DRBC released revised draft regulations. (NGO Pls. Mem. at 8.) That same month, two of the DRBC commissioners indicated that they would likely vote against the adoption of the regulations. (*Id.*) The DRBC

---

[3]     Some exploratory wells were permitted to go forward before this policy was adopted; it is the court's understanding that those exploratory operations have now been completed. *See Delaware Riverkeeper Network v. Delaware River Basin Commission*, No. 11-CV-423, 2012 WL 3638699 (D.N.J. Aug. 22, 2012).

cancelled its meeting scheduled for consideration of the regulations and there has been no change in the status of the draft regulations since then. (*Id.*) The moratorium on natural gas development in the Delaware River Basin remains in place.

Concerns about the potential effects of natural gas development in the Basin have been expressed in several ways. The United States Fish and Wildlife Service and the National Park Service have noted that development in the Basin could have individual and cumulative effects on the resources those services manage, which include migratory birds that pass through the region and the national park properties that are part of the Upper Delaware River Basins. (Silver Decl. ¶ 9.c.) Defendant Environmental Protection Agency is conducting a study of the risks hydrofracking may pose to drinking water supplies. (*Id.* ¶ 9.d.) The New York Department of Environmental Conservation has recommended that natural gas development be banned in the New York City Watershed, which includes part of the Delaware River Basin, to preserve the watershed's supply of clean, unfiltered water. (*Id.* ¶ 9.f.) The Council of the City of Philadelphia has expressed concerns about the risks hydrofracking in the Basin poses to its drinking water supply, which comes from the Delaware and its tributaries. (Philadelphia City Council Mem. (11-CV-2599 Docket Entry # 83) at 5-7.)

Plaintiffs provide descriptions of the hydrofracking process itself. Hydrofracking uses both water and chemical additives; many of these additives are compounds that are considered carcinogenic or otherwise dangerous for human consumption. (Silver Decl. ¶ 12.) The hydrofracking can liberate naturally occurring brine liquids that can contain toxic and radioactive compounds; this brine can mix with the fluids used in the fracturing. (*Id.* ¶ 14.) The fluid used in the fracturing and the brine can flow back up the well and are collected at the surface; this combined fluid also contains dissolved solids from the shale formation and must be treated rather

9

than dumped in surface water bodies. (*Id.* ¶¶ 15-18.) Adding this fluid to freshwater bodies could pose a danger to the water quality and the survival of aquatic organisms. (*Id.* ¶ 17.) Plaintiffs aver that leaks, spills, and other accidents are likely to occur that would result in the mixing of the well discharges with ground and surface water. (*Id.* ¶¶ 19-20.)

Plaintiffs offer examples of when hydofracking by-products have contaminated surface waters in Pennsylvania, where hydrofracking is permitted outside the Delaware River Basin. For example, eleven public water suppliers that drew their water from a certain river were affected when wastewater treatment plants along that river were unable to sufficiently treat drilling well wastewater and released that water into the river. (*Id.* ¶ 23.) Three spills at one well adversely affected the drinking water of the homes of nineteen families. (*Id.* ¶ 26.) Another well failed and contaminated a creek, forcing the evacuation of seven families. (*Id.* ¶ 25.) Another well produced polluted water that flowed across the border into a state park in New York, leading to violations of state water quality standards. (*Id.* ¶ 24.)

D.     PROCEDURAL HISTORY

Plaintiff New York State filed suit against the Federal Defendants on May 31, 2011. (NYS Compl. (11-CV-2599 Docket Entry # 1).) On August 4, 2011, the DRN Plaintiffs brought suit against the DRBC, its federal representative, and the Army Corps of Engineers. (DRN Pls. Compl. (11-CV-3780 Docket Entry # 1).) On August 10, 2011, Damascus Citizens for Sustainability, Inc., brought suit against the DRBC and the Federal Defendants. (Damascus Citizens Compl. (11-CV-3857 Docket Entry # 1).) The latter two cases were reassigned to the undersigned from District Judge Dora L. Irizarry. (Aug. 5, 2011 Reassignment Order; Aug. 11, 2011 Reassignment Order.) All three cases were consolidated for pre-trial purposes. (Aug. 10, 2011 Minute Entry.) The Oil and Gas Industry filed a motion to intervene as a Defendant in the

10

three cases shortly thereafter. (Mot. to Intervene (11-CV-2599 Docket Entry # 13).) New York later filed an Amended Complaint that added claims against the DRBC. (NYS Am. Compl. (11-CV-2599 Docket Entry # 51).)

The Defendants have moved to dismiss the three Complaints under both Federal Rule of Civil Procedure 12(b)(1), arguing Plaintiffs lack standing, present unripe claims, and that the Federal Defendants have not waived their sovereign immunity, and Rule 12(b)(6), arguing that NEPA does not apply to Federal Defendants' actions in this context, that there is no final action as defined by the APA, that the DRBC is not a federal agency, and that NEPA cannot be enforced except through the APA; the Federal Defendants have moved in the alternative for summary judgment. (Fed. Defs. Mot (11-CV-2599 Docket Entry # 75); DRBC Defs. Mot. (11-CV-2599 Docket Entry # 76).) New York State has filed an opposition and a cross-motion for summary judgment on liability, and the two sets of NGO Plaintiffs have filed a single opposition and cross-motion. (NYS Mem.; NGO Pls. Mem.) The court held oral argument on July 31, 2012.

## II.    STANDARD OF REVIEW

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A Rule 12(b)(1) motion is the proper vehicle for arguments that a defendant is protected by sovereign immunity, *Wake v. United States*, 89 F.3d 53, 57 (2d Cir. 1996), that plaintiffs lack standing to sue, *Alliance for Envtl. Renewal, Inc., v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2005), and that a claim is unripe, *see, e.g.*, *Benincasa v. N.Y. Dep't for Envtl. Conservation*, 85 F. App'x 244, 245 (2d Cir. 2004).

A district court must resolve challenges to the Article III standing of a party and other Article III-based challenges to its jurisdiction before it may rule on the merits of a case. *Alliance for Envtl. Renewal, Inc.*, 436 F.3d at 87 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)).

A court must accept as true all material factual allegations in a complaint when evaluating whether the complaint has properly invoked federal subject matter jurisdiction. *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The court may not draw inferences favorable to the non-moving party from the complaint. *Id.* (citing *Norton v. Larney*, 266 U.S. 511, 515 (1925)). A district court may consider evidence outside the pleadings to resolve disputed factual issues relating to jurisdiction. *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998).

Because consolidation of cases under Federal Rule of Civil Procedure 42(a) is a "procedural device," "[i]t does not change the rights of the parties in the separate suits" and a court must consider "the jurisdictional basis of each complaint." *Cole v. Schenley Indus., Inc.*, 563 F.2d 35, 38 (2d Cir. 1977).

## III.    DISCUSSION

### A.    SOVEREIGN IMMUNITY

The court considers Defendants' 12(b)(1) arguments in the order presented by the Federal Defendants. The first argument is that the Federal Defendants are protected from suit by sovereign immunity and so they must be dismissed from these suits. (Fed. Defs. Mem. (11-CV-2599 Docket Entry # 75-1) at 5.) "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Therefore, parties suing a United States agency must identify

12

an applicable waiver of sovereign immunity. Plaintiffs argue that their suits utilize the waiver of immunity found in the APA, 5 U.S.C. § 702. (*See* NGO Pls. Mem. at 28-29.) The Federal Defendants argue that the waiver found in § 702 can be used only for an APA claim, and since the Federal Defendants also argue that Plaintiffs do not allege a valid APA claim (specifically, the Federal Defendants argue that Plaintiffs do not allege a valid final action as required for a § 706(2) claim), the Federal Defendants claim that Plaintiffs cannot use the waiver found in the APA. (Fed. Defs. Mem. at 9-14.) Plaintiffs disagree and argue that the waiver is a general one for all actions seeking equitable, non-monetary relief against an agency of the United States, and they can invoke it even if their APA claims are otherwise faulty, or even if they are not seeking relief under the APA at all. (NGO Pls. Mem. at 28-29.)

The second sentence of 5 U.S.C. § 702 states that "an action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall be not be dismissed nor relief therein be denied on the ground that it is against the United States." The Second Circuit has characterized this language as "waiv[ing] the federal government's sovereign immunity in actions [for non-monetary relief against an agency or officer thereof] brought under the general federal question jurisdictional statute." *Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008) (quoting *Lunney v. United States*, 319 F.3d 550, 557-58 (2d Cir. 2003)) (second alteration in original). The panel's characterization of the waiver is that it is applicable to any equitable action, not just one alleging a cause of action under the APA. Moreover, other circuits have expressly held that that the plain language of the waiver, and the legislative history of the bill that added the waiver to the APA, make clear that the waiver applies to any equitable action, regardless of whether the APA provides the cause of action or not. *See*

13

*Trudeau v. FTC*, 456 F.3d 178, 186-87 (D.C. Cir. 2006); *Accord United States v. City of Detroit*, 329 F.3d 515, 521 (6th Cir. 2003); *Presbyterian Church v. United States*, 870 F.2d 518, 525 (9th Cir. 1989). As *Trudeau* discusses, if the waiver is meant to apply to any equitable claim whether brought under the APA or not, then it certainly should not matter, for the purposes of sovereign immunity, that a plaintiff has attempted to allege an APA claim and failed to allege one of the elements. *Trudeau*, 456 F.3d at 187.

The court agrees with the *Trudeau* court. The waiver embraces equitable actions against agencies of the United States generally; any failure on the part of Plaintiffs to allege a final action as that term is used in the APA is properly an argument that Plaintiffs have failed to state a claim, not that the Federal Defendants are immune from suit.

B.    STANDING

The Defendants challenge Plaintiffs' Article III standing to bring suit. The test for constitutional standing requires a plaintiff to show that there is: 1) an injury-in-fact, that is, an actual or imminent, and concrete and particularized, invasion of some legally protect interest of the plaintiff's; 2) a fairly traceable causal connection between the actions of the defendant and the injury-in-fact; and 3) a likelihood that a favorable decision will redress plaintiff's complained-of injury. *See Lujan v. Defenders of Wildlife*, 505 U.S. 555, 560-561 (1992). A plaintiff can show her standing to enforce a procedural right "without meeting all the normal standards for redressability and immediacy" but must show a concrete interest affected by the procedural breach, *id.* at 572 n.7, and that interest cannot be a mere desire to see the law obeyed, *id.* n.8. The Supreme Court has reiterated that the deprivation of a procedural right without some concrete interest being impaired—the deprivation of a "procedural right *in vacuo*"—does not confer standing. *Summers v. Earth Island Institute*, 555 U.S. 488, 496-97 (2009). In

14

environmental cases, plaintiffs can demonstrate their standing by showing they do or intend to use the relevant environment for, inter alia, fishing, camping, swimming, and bird watching; they may also show that property rights are less valuable as a consequence of the challenged actions. *See Friends of the Earth Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 181-84 (2000).

The court considers the interests New York offers first. New York, like other states, may bring suit to protect interests of at least three different categories: sovereign, quasi-sovereign, and proprietary. *Alfred L. Snap & Son, Inc., v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-02 (1982). A state's proprietary interest is an interest the state has by virtue of properties or business ventures that it may own just as an individual or corporation might. *Id.* A "quasi-sovereign" interest is the state's interest in the "health and well-being—both physical and economic—of its residents." *Id.* at 607. The traditional examples of this interest have been suits by states seeking the abatement of public nuisances emanating from other states. *Id.* at 602-05 (collecting cases). Thus, when considering whether New York has identified a concrete interest it seeks to protect, it may identify either a proprietary or quasi-sovereign interest.

New York is not asserting any interest involved in protecting the New York City Watershed or in preventing drilling in New York State. The parties agree that, regardless of what the DRBC does, New York State retains the authority to regulate natural gas development within its own borders, including the New York City Watershed. (NYS Mem. at 16; Fed Defs. Mem. at 17-8.) Therefore the court cannot consider those interests in evaluating whether New York has standing.

One set of interests that New York does assert relate to maintaining the status quo in the Upper Delaware River, a portion of the Delaware River that forms the boundary between part of Pennsylvania and New York. (Rudge Decl. (Docket Entry # 78) ¶ 5.) The Upper Delaware is

15

home to various mussel species, some of which are endangered; various fish species; and Bald Eagle populations. (*Id.* ¶¶ 8-14.) New York claims ownership of the shellfish, fish, birds, and other animals that live wild on New York's land and in its waters. (*Id.* ¶ 15.) New York also owns land, facilities, and the rights to conservation easements along the Upper Delaware, that it makes available to New York residents and others interested in recreational opportunities such as camping, hiking and bird watching. (*Id.* ¶¶ 16-19.) These property rights give New York concrete proprietary interests that relate to the health of the Upper Delaware.

New York's other asserted interest is tied to preventing increases in ozone ($O_3$) concentrations over New York's populations. Ozone is a molecule that can form from atmospheric reactions of nitrogen oxides ($NO_x$) and volatile organic compounds (VOCs). (Chinkin Decl. (Docket Entry # 77-7) ¶ 14.) These compounds are produced during natural gas development. (*Id.* ¶¶ 27-33.) Molecules in the atmosphere, such as ozone, may form over one location and move into the airspace above another location. (*Id.* ¶ 18.) Ozone can cause respiratory health problems. (Schwartz Decl. (Docket Entry # 77-9) ¶¶ 9-12.) Chief among those problems are asthma attacks. (*Id.* ¶¶ 17-19.) Ozone may also be linked to higher mortality rates. (*Id.* ¶¶ 24-28.) Asthma attacks, such as those associated with higher atmospheric concentrations of ozone, are sometimes treated through hospital and emergency room admissions. (*Id.* ¶ 19.) Asthma attacks and hospital visits are higher in the population of people enrolled in Medicaid than in the general population. (*Id.* ¶ 22.) Because Medicaid is in part state-financed, New York pays part of the treatment costs of Medicaid enrollees who suffer from asthma. (*Id.* ¶ 21.) The State's interest in protecting its own budget is a pecuniary interest analogous to one that any individual or business might possess; in short, a proprietary interest. Moreover, its desire to prevent its residents from suffering from increased ozone exposure is

16

analogous to a state's desire to secure the abatement of a public nuisance—in other words, a quasi-sovereign interest in the health of its residents.

The court next turns to analyzing the claims of the NGO Plaintiffs to determine whether they have identified concrete interests. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue on their own right, the interests at stake are germane to the organization's purpose, and . . . the claim asserted [does not] require[] the participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181. Therefore, in analyzing the standing of Damascus Citizens for Sustainability, the Delaware Riverkeeper Network, Riverkeeper, Inc., and the National Parks Conservation Association, the court must evaluate whether individual members of those organizations have standing, i.e., concrete interests and injuries-in-fact.

Plaintiff Damascus Citizens for Sustainability, Inc., puts forward declarations of three of its members in support of its standing. All three own properties close to the Delaware River. (Westfall Decl. (NGO Pls. 56.1 Statement Ex. N (Docket Entry # 79-3)) ¶ 1; Arrindell Decl. (NGO Pls. 56.1 Statement Ex. O) ¶ 1; Levine Decl. (NGO Pls. 56.1 Statement Ex. P) ¶ 1.) One declarant avers to fishing, swimming, and boating in the River and using water from a well on his property for drinking and crop irrigation. (Westfall Decl. ¶¶ 2-3.) A second declarant avers to swimming and boating and using water from a well located on her property for drinking and irrigation of a garden that supplies a large portion of her sustenance. (Arrindell Decl. ¶¶ 1-2.) A third declarant avers to hiking, cross-country skiing, and snow-shoeing in the River Basin and canoeing, kayaking, fishing, and swimming in the River. (Levine Decl. ¶ 2.) These property rights and recreational and sustenance-related activities provide these declarants concrete interests in the health of the Upper Delaware River and its Basin, and preserving the integrity of

water wells in the Basin.  Through them, Damascus Citizens for Sustainability, Inc., has concrete interests as well.

The Delaware Riverkeeper Network puts forward declarations from several members who live in the Upper Delaware River Basin.  One declarant avers she uses private well water for business and drinking purposes and uses the River recreationally.  (Weiner Decl. (NGO Pls. 56.1 Statement Ex. B) ¶¶ 11, 14.)  Two members aver they operate an organic farm on land close to and adjacent to the River, using water from private wells, and use the River for swimming, canoeing, fishing, and bird watching.  (Swartz Decl. (NGO Pls. 56.1 Statement Ex. C) ¶¶ 4, 24; Kowalchuk Decl. (NGO Pls. 56.1 Statement Ex. D) ¶¶ 4, 21.)  A fourth declarant owns land on the Delaware River and uses the River for swimming, canoeing, and bird watching and obtains drinking water from a well.  (Yeaman Decl. (NGO Pls. 56.1 Statement Ex. E) ¶¶ 4, 6, 16.)  As with the Damascus Citizens for Sustainability declarants, these property rights, business activities, and recreational activities provide these declarants with concrete interests in the health of the Upper Delaware River and its Basin, and preserving the integrity of wells in the Basin.  Therefore, Delaware Riverkeeper Network has concrete interests as well.

Riverkeeper, Inc., provided declarations from three declarants who are members of that organization.  One declarant owns property on a tributary of the Delaware, and fly fishes in that region's rivers.  (LaRocca Decl. (NGO Pls. 56.1 Statement Ex. F) ¶¶ 4-5, 7.)  Another declarant owns land in the Basin and fly fishes the Delaware River and its tributaries.  (Huhner Decl. (NGO Pls. 56.1 Statement Ex. G) ¶¶ 1, 5.)  A third owns land in the Basin and uses that land for hiking, bird watching, and organic gardening.  (Lipshitz Decl. (NGO Pls. 56.1 Statement Ex. H) ¶¶ 4-5, 7.)  These property rights and recreational activities provide the declarants with concrete

18

interests in the health of the tributaries of the Delaware and its Basin in New York, and through them, provides Riverkeeper, Inc. with interests as well.

The National Parks Conservation Association puts forward the declarations of two individual members who have used and desire to continue to use the Delaware Water Gap National Recreation Area for hiking and canoeing. (Brach Decl. (NGO Pls. 56.1 Statement Ex. L) ¶¶ 3-4; Waldbuesser Decl (NGO Pls. 56.1 Statement Ex. M) ¶ 3.) These aesthetic and recreational activities provide the declarants with concrete interests in preserving the Delaware Water Gap National Recreation Area and, consequently, provide the National Parks Conservation Association with concrete interests.[4]

The court turns next to consider whether Plaintiffs have alleged an injury-in-fact, i.e., an actual or threatened invasion of their interests. Because NEPA is a procedural statute—i.e., it requires agencies to engage in certain steps when considering an issue, but does not mandate that agencies come to any particular decision once they have gone through those steps—courts often analyze injury-in-fact in NEPA cases according to the Supreme Court's dicta in *Lujan v. Defenders of Wildlife*: "procedural rights are special: the person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." 504 U.S. at 572 n.7. The Supreme Court offered a hypothetical example of a plaintiff who had standing to challenge a federal agency's failure to issue an EIS when licensing a dam scheduled to be built near nearby "even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Id.* Following that

---

[4] Having concluded that the associations that brought the 11-CV-3780 Complaint have standing, the court declines to resolve whether the two individual Plaintiffs—the so-called "Delaware Riverkeeper" and "Hudson Riverkeeper"—in that action have standing. *See Mass. v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.).

hypothetical, courts have concluded that plaintiffs have had standing to challenge agencies'
violations of NEPA when an agency has taken an action without an EIS and the action has
created a risk of injury. For example, when a defendant government agency had approved a land
transfer to a private party without an EIS, a plaintiff who had shown a "credible threat to the
plaintiff's physical well-being from airborne pollutants" had an injury-in-fact. *Hall v. Norton*,
266 F.3d 969, 976 (9th Cir. 2001). Similarly, a plaintiff had standing to challenge the issuance
of a final forest plan without an EIS based on a "reasonable probability that the challenged
procedural violation will harm the plaintiff's concrete interests" in enjoying national forests.
*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003) (internal
quotation marks omitted). And a plaintiff had standing to challenge the issuance of an amended
plan for a particular national forest without a new EIS by showing that "it is reasonably probable
that the challenged action will threaten" plaintiff's members' interests in using the forest.
*Ouachita Watch League v. Jones*, 463 F.3d 1163, 1170 (11th Cir. 2006). A plaintiff properly
alleged an injury-in-fact where a defendant agency had granted a road easement without issuing
an EIS, because "[a]n injury under [] NEPA results . . . from the agency's uninformed
decisionmaking." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002)
(quotation marks and citation omitted.) Where defendant agency proposed to build a levee
without issuing an EIS, plaintiff had standing to sue because "the injury-in-fact is increased risk
of environmental harm stemming from the agency's allegedly uninformed decision-making."
*Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006).

Various Second Circuit opinions have recognized the idea of standing based on increased
risk or possible increased risk; but in each case, the government had acted in the form of a final
order, regulation, plan, denial of a request, or statute. For example, in *New York Public Interest*

20

*Research Group v. Whitman*, 321 F.3d 316, 325-26 (2d Cir. 2003), the EPA had completed a final rule-making that approved of New York's decision to not reduce stationary source air pollution as allegedly required by the Clean Air Act; the plaintiffs were concerned that existing and then-emitting sources of pollution might cause them health problems, and the court held that the risk of possible health problems stemming from unregulated pollution created standing. In another case, where the EPA had granted a permit to a stationary source polluter and that polluter was producing enough sulfur dioxide ($SO_2$) fumes that the plaintiff would "likely" be exposed to them due to her proximity to the source of the emissions, the petitioner had standing to challenge the EPA's decision to grant a permit. *LeFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002). In *Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003), the court found that the plaintiff had standing to challenge the Department of Agriculture's denial of his request for a rule-making based on the risk of eating contaminated meat created by the existing state of regulation perpetuated by the denial—recognizing that "an unreasonable risk of exposure [to contaminated meat] may itself cause cognizable injury." But the panel required the plaintiff to show "direct risk of harm that rises above mere conjecture." *Id.* at 636. The court further remarked that "[g]iven the potentially expansive and nebulous nature of enhanced risk claims, we agree that plaintiffs [] must allege a credible risk of harm to establish injury-in-fact based on exposure to enhanced risk." *Id.* at 637 (quotation marks omitted). Of relevance here, the court recognized as support for plaintiff's standing that the plaintiff's "alleged risk of harm arises from an established government policy." *Id.* Most recently, in *Amnesty International v. Clapper*, 638 F.3d 118, 135 (2d Cir. 2011), the Second Circuit noted that plaintiff could show standing for "an injury based on prospective government action [by showing] a realistic danger of direct injury." (quotation marks omitted). A court considering such a case must engage in "an inquiry into the probability

21

of future harm," *id.* at 136, and "[o]ne factor that bolsters a plaintiff's argument that injury is likely to come to pass . . . is the existence of a policy that authorizes the potentially harmful conduct," *id.* at 137.

Clearly, a plaintiff can show an injury-in-fact through showing the creation of an increased risk of invasion of concrete interests; in NEPA cases, this chain of reasoning is extended to allow for an injury based on the increased risk in uninformed decision-making that will create an increased risk in the invasion of a concrete interest. However, in all but one case cited above, the defendant government agency has done something that has affected legal rights or obligations of some party in a way that made an invasion of plaintiff's interests more likely, or refused to do something that allowed an already existing invasion to continue.[5] Neither situation exists in this case. Plaintiffs do not point to, the court is not aware of, case law that finds an injury-in-fact in a situation like Plaintiffs'. The line between proposed regulations and final regulations may be subtle, but the court believes it is real, in both the NEPA cases and in the other probabilistic injury cases.

Nor will this court extend the concept of injury-in-fact as Plaintiffs request. First, with a mere draft, the court has no way of judging reliably how probable it is that the regulation will be enacted, and thus no way of judging whether risks that natural gas development may create are more than conjecture, as *Baur v. Veneman* requires. Moreover, while the Supreme Court in *Lujan* stated that the concept of immediacy is "relaxed" in procedural rights cases, 504 U.S. at 562 n.7, it did not say that it was eliminated, which would be the effect of adopting Plaintiffs'

---

[5] The exception is *Sierra Club v. U.S. Army Corps of Engineers*, where the court found a plaintiff had standing to challenge the Army Corps of Engineers' proposal to build a levee, even though additional approvals by other agencies were required before construction could commence. 446 F.3d at 815-16. To the extent that holding conflicts with the Second Circuit decisions discussed above, this court is bound by the latter set of case law. Moreover, even in *Sierra Club v. U.S. Army Corps of Engineers* the defendant agency had completed its decision-making, unlike the Defendants in the instant cases.

reading of the concept of injury-in-fact. Indeed, *Lujan* noted that "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* at 564-65 n.2. Moreover, in *Summers* the Supreme Court reiterated that a procedural right could only be enforced by a plaintiff who suffered the *invasion* of a concrete interest. 555 U.S. at 496-97. While the court acknowledges that heightened risk of invasion may constitute an injury-in-fact—as discussed in the case law cited above—the court believes that the reasoning found in this line of case law cannot be extended indefinitely backward, to embrace internal agency deliberations, drafts, or legal analyses unattached to an actual agency action, without undermining the principles the Supreme Court has announced in *Lujan* and similar decisions about Article III standing. While Plaintiffs provide a great deal of support for how their interests may be threatened if natural gas development is allowed in parts of the Basin, as of now it is not allowed, and the mere existence of proposed regulations is not sufficient to allow this court to say Plaintiffs' interests are at risk.[6]

Plaintiffs appear to believe that, if Defendants are not forced to comply with NEPA now, their interests will be placed at risk immediately. But that is not the case. The courts will be available if and when the DRBC adopts final regulations permitting natural gas development, and are more than capable of preliminarily enjoining any development so that no wastewater is created before the courts have evaluated whether the DRBC and the Federal Defendants are obligated to follow NEPA in this instance.

---

[6]     The court is aware that 40 C.F.R. § 1502.5 states that a draft EIS "normally" should accompany draft regulations. However, Plaintiffs provide no support for the idea that this regulation confers Article III standing on someone whose risks have not yet been increased by uninformed decision-making—that increase in risk of injury comes after the decision has been made—and in any case, Plaintiffs cannot seek judicial review on an agency's compliance with CEQ's regulations until that agency has "taken action that will result in irreparable injury." *Id.* § 1500.3  None of Defendants' actions have come close to creating an irreparable injury at this point.

The NGO Plaintiffs also allege they have organizational standing separate from their associational standing on behalf of their members, in that they have been injured by difficulties in "disseminating information on the environmental impacts of gas drilling in the Basin . . . and in commenting on the Draft Regulations based on a full understanding of the DRBC's or the Corps' evaluation of the environmental impacts thereof." (NGO Pls. Mem. at 37.) The court disagrees with Plaintiffs that *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, (2d Cir. 1993), supports their assertion of this form of standing. In *Ragin*, the court held that an organization dedicated to opposing housing discrimination had standing to sue a defendant alleged to have violated the Fair Housing Act based on the resources the organization had to dedicate to opposing the defendant's discriminatory behavior. *Id.* at 905. The court does not believe the current situation is analogous. In *Ragin*, the defendant was already engaging in illegal behavior that had already produced an injury to individual victims of housing discrimination, and the plaintiff organization suffered an additional injury countering that initial one. Here, as explained above, no one's concrete interests have been invaded, so there is no initial injury to counter. Plaintiffs do not cite to any Second Circuit case recognizing an injury-in-fact in the form of decreased information dissemination on a governmental policy that has not inflicted any other injury.

Because the court holds that there is no injury-in-fact, the court does not (indeed, could not) address whether there is a causal connection between Defendants' actions and Plaintiffs' injuries, nor whether a court order could redress Plaintiffs' injury. Additionally, the court does not reach the issue of whether there is a so-called *parens patriae* bar that strips New York of standing to sue the Federal Defendants to assert its quasi-sovereign interests.

24

C.    RIPENESS

Having concluded that Plaintiffs' Complaints should be dismissed for lack of standing, the court nonetheless considers the parties' arguments as to ripeness out of an abundance of caution and as an alternative ground for disposition. The court notes that the doctrine of ripeness has both constitutional and prudential strands. *Simmonds v. INS*, 326 F.3d 351, 356-57 (2d Cir. 2003). Constitutional ripeness and constitutional injury-in-fact analysis overlap, and a plaintiff that can assert an injury-in-fact will usually have a constitutionally ripe claim. *Id.* at 358. Conversely, because the court has held that there is no present injury-in-fact, the court believes it is clear that Plaintiffs have not alleged a constitutionally ripe claim. *See Brennan v. Nassau County*, 352 F.3d 60, 65 n.9 (2d Cir. 2003) (quoting 15 James Wm. Moore, Moore's Federal Practice § 101.71 (3d Ed. 2003) ("The doctrines of ripeness and standing are intertwined . . . If a plaintiff has not yet suffered a concrete injury-in-fact, he or she lacks standing . . . [y]et such a suit could also be said to suffer from a lack of ripeness . . . .")).

Nonetheless, the court will assume arguendo that Plaintiffs have alleged constitutionally ripe claims and will consider whether Plaintiffs' claims are prudentially ripe. In analyzing whether a claim is prudentially ripe, "we ask: (1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Simmonds*, 326 F.3d at 359. In so doing, the court is attempting to answer the question of "whether [Plaintiffs'] claims would better be heard now or at some point in the future." *Id.*

The NGO Plaintiffs argue that their claims are in the nature of mandamus—under both the mandamus statute, 28 U.S.C. § 1361, and under the APA cause of action to compel agency action unlawfully withheld, 5 U.S.C. § 706(1)—and are not subject to a prudential ripeness inquiry. (NGO Pls. Mem. at 39-43.) Plaintiffs' argument lacks support: the decision Plaintiffs

25

cite in support of that argument as to the mandamus statute clearly refers to the fact that there is no sovereign immunity bar to an otherwise valid mandamus claim; it does not address whether prudential ripeness doctrine is applicable to mandamus claims. *See Washington Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 901-902 (D.C. Cir. 1996). Plaintiffs similarly fail to cite a decision holding that a court may not engage in a ripeness inquiry for a § 706(1) claim.

Plaintiffs also argue that prudential ripeness is not relevant to NEPA challenges because of the Supreme Court's *Ohio Forestry Association v. Sierra Club*, 523 U.S. 726 (1998), decision. In *Ohio Forestry*, the Supreme Court held that a challenge to the substance of a national forest plan was not ripe because the plan required additional steps, such as the issuance of permits, before logging would take place. *Id.* at 732-36. The decision compared the challenge before it to a NEPA challenge (something not before it): "NEPA, unlike [the National Forest Management Act] simply guarantees a particular procedure [.] Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* at 737. Plaintiffs interpret this language as eliminating prudential ripeness as an inquiry in NEPA cases. This court disagrees. First, the *Ohio Forestry* language is dicta, because the Supreme Court was not confronted with a NEPA challenge; therefore, this court need not follow it. *Jimenez v. Walker*, 458 F.3d 130, 143 (2d Cir. 2006) ("Dicta [is] not and cannot be binding." (internal quotation marks omitted)). Second, the court does not believe the Supreme Court would intend to attempt to abrogate its prudential ripeness case law as to NEPA claims in a few sentences of dicta. The court interprets this statement in the context of the remainder of *Ohio Forestry*, where the Court held that the issuance of a final plan was not enough to render the plaintiff's claim for substantive

unreasonableness ripe; the implication of the Supreme Court's comment about a hypothetical NEPA challenge is that such a challenge would be ripe at the time a final plan was issued.

Turning to the application of doctrine of prudential ripeness to Plaintiffs' claims, the court considers first the claims' fitness for judicial review. *See Simmonds*, 326 F.3d at 359. The court concludes that this dispute is not currently fit for judicial review. The harms that Plaintiffs ultimately are concerned about are speculative, and rely on a chain of inferences that may never come to pass. Plaintiffs' concerns would be mooted if the DRBC declined to issue final regulations authorizing natural gas development and left the current moratorium in place. *Cf. Motor Vehicles Mfrs. v. N.Y. Dep't of Envtl. Conservation*, 79 F.3d 1298, 1305 (2d Cir. 1996) ("Although plaintiffs speculate that New York will pass the necessary legislation [and] promulgate the appropriate regulations [to require additional testing to which plaintiffs object,] such programs do not presently exist. . . . The likelihood—or even the possibility—that additional tests will not be needed makes plaintiffs' claim entirely hypothetical and unfit for adjudication.") Even if final regulations were to be passed, it is possible that the content of those regulations, or other actions by other regulators, would ban natural gas development in certain areas, which would affect who would have standing to pursue a claim relating to those (hypothetical) final regulations permitting natural gas development.

The court next considers whether delay would impose any hardship on the parties. The court does not believe delay would do so: Plaintiffs challenge something that is, at present, a legal interpretation that merely affects the internal operations of Defendants. First, it does not create legal rights of obligations for either Plaintiffs or any third parties. *Cf. Ohio Forestry Association*, 523 U.S. at 733 ("[T]he provisions of the Plain that the Sierra Club challenges do not create adverse effects of a strictly legal kind."). Second, the moratorium ensures that there is

no practical effect from Defendants' failure to consider the environmental impact of natural gas development according to NEPA. *Cf. id.* ("Nor [does] the Plan now inflict[] practical harm upon the interests that the Sierra Club advances."). Finally, Plaintiffs are not confronted with the potential hardship of choosing between conforming their behavior to an anticipated order or risking the hardship of a government enforcement action. *Cf id.* at 734 ("Nor has the Sierra Club pointed to any other way in which the Plan could now force it to modify its behavior in order to avoid future adverse consequences as, for example, agency regulations can sometimes force immediate compliance through fear of future sanctions.").

As both the fitness for review and hardship of delay prongs of prudential ripeness suggest, Plaintiffs' claims can and should wait until, at least, if or when the DRBC ends the moratorium currently in place.[7]

## IV.    REMAINING MOTIONS

The court notes that, should the DRBC adopt regulations that permit natural gas development within the river basin without performing an EIS, then at some point, some court would be required to address multiple difficult issues, including: (1) whether NEPA can be enforced through a cause of action other than the APA; (2) whether the DRBC is a federal agency; (3) and whether, even if not, the presence of a federal officer on the DRBC, and the support and assistance federal agencies give to the DRBC, are sufficient to "federalize" the DRBC's actions. Should the Division Engineer vote for or concur in these hypothetical DRBC regulations, then a court would be required to consider additional questions, including: (4) whether either a vote for or concurrence in a DRBC regulation is a "major federal action" under

---

[7]    Although not part of the prudential ripeness analysis described in Supreme Court decisions, the court notes additionally that delay will likely further judicial efficiency. Should the DRBC adopt regulations that permit natural gas development, it is reasonable to foresee challenges beyond NEPA compliance (e.g., a challenge to substantive reasonableness of the regulations). Resolving a substantive challenge alongside the NEPA one would reduce the overall amount of judicial resources devoted to these issues.

28

NEPA; and (5) whether either a vote or a concurrence is a "final action" under the APA. Finally, if the course of this litigation is predictive of that future litigation, then a court would also be required to consider: (6) whether the Oil and Gas Industry has a legal interest in a regulatory agency *not* performing an EIS. At this point, however, Plaintiffs in these cases complain of only a difference in legal interpretation and ask the court for what would be essentially an advisory opinion on these issues. The court stresses that, because it has concluded it lacks subject matter jurisdiction over this case, it does not express an opinion on these myriad other questions that the parties have presented to it. Defendants' motions to dismiss for failure to state a claim (and the Federal Defendants' motion in the alternative for summary judgment), Plaintiffs' motions for partial summary judgment, putative Defendant-Intervenors' motions for intervention, and Plaintiffs' motion to strike putative Defendant-Intervenors' declarations are denied as moot.

## V.    CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED without prejudice as to all three Complaints. The remaining pending motions are denied as moot. The Clerk of Court is directed to close these three cases.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       September 2⁴, 2012

NICHOLAS G. GARAUFIS
United States District Judge